SEALED

s/ MF

ORDERED UNSEALED on 09/11/2026 s/ MariaFujit

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>KHETAM KHLIEF HAOUASH,<br>Defendant. | Case No.: 26mj5187<br>**COMPLAINT FOR VIOLATION OF**<br>Title 18, U.S.C., Sec. 1343 – Wire Fraud; Title 18, U.S.C., Sec. 1957 Money Laundering; Title 18, U.S.C., Secs. 981(a)(1)(A), (C), 982(a)(1), (2) and Title 28, U.S.C., Sec. 2461(c) and Title 21, U.S.C., Sec. 853 - Criminal Forfeiture<br>**[UNDER SEAL]** |

The undersigned complainant being duly sworn states:

At all times relevant to this Complaint:

## INTRODUCTION

1. The United States Department of Health and Human Services ("HHS") provided federal funding to states, including the State of California, to help low-income families pay for childcare expenses.

2. In California, four programs provided subsidies to childcare providers servicing income-eligible families: CalWorks Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP").

3. In the Southern District of California, the County of San Diego administered "Stage 1" subsidies, and two community organizations,

Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administered subsidies through the C2AP, C3AP, and CAPP.

4. Generally, if CDA or YMCA determined that a family was eligible to receive subsidized childcare services and the family's selected childcare provider (i) registered with CDA or YMCA, (ii) had an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and (iii) submitted monthly attendance records documenting the childcare they provided, CDA and YMCA paid subsidies directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

5. Monthly attendance record forms had "self-certification" and signature sections for both the childcare provider and the parent, both of which began, "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" Without a completed and signed attendance record, CDA and YMCA did not issue payment to registered childcare providers.

6. CDA and YMCA used a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms included the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month.

7. Childcare providers could submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application. All submissions resulted in a copy of the completed attendance record being transmitted, over interstate wire communications, to the third-party software company's servers in Oregon.

8. California regulations stated in part, "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

9. Defendant KHETAM KHLIEF HAOUASH, a resident of the Southern District of California, operated "HAOUASH, KHETAM FAMILY CHILD CARE" at an apartment on Ballantyne Street in El Cajon, California, within the Southern District of California. The license, effective May 12, 2021, authorized HAOUASH to provide care to up to eight children at the facility on Ballantyne Street.

10. Defendant KHETAM KHLIEF HAOUASH submitted to CDSS applications for a "location change" and later, a "capacity change", and received a license from CDSS to operate "HAOUASH, KHETAM FAMILY CHILD CARE" at an address on Emerald Avenue in El Cajon, California, within the Southern District of California. The license, effective October 24, 2022, authorized HAOUASH to provide care to up to 14 children at the facility on Emerald Avenue.

11. Defendant KHETAM KHLIEF HAOUASH submitted to CDSS an application for a "location change" and received a license from CDSS to operate "HAOUASH, KHETAM FAMILY CHILD CARE" at an address on Skyview Street in El Cajon, California, within the Southern District of California. The license, effective May 10, 2024, authorized HAOUASH to provide care for up to 14 children at the facility on Skyview Street.

///

///

**Counts 1-4**

**(Wire Fraud)**

**[18 U.S.C. § 1343]**

12. Paragraphs 1 to 11 are re-alleged and incorporated herein.

13. Beginning on a date unknown, but no later than May 12, 2021, and continuing up to and including on or about July 1, 2026, within the Southern District of California and elsewhere, defendant KHETAM KHLIEF HAOUASH knowingly and with the intent to defraud, devised, participated in, and executed a material scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and intentional concealment and omission of material facts.

**Manner and Means**

14. The fraudulent scheme and artifice to defraud was operated and was carried out, and to be carried out, in substance, as follows:

15. Defendant HAOUASH applied for and received from CDSS licenses to operate childcare facilities in the Southern District of California.

16. After obtaining licenses from CDSS, defendant HAOUASH registered with CDA and YMCA as the childcare provider for families that received subsidized childcare services.

17. Defendant HAOUASH, using the third-party software, accessed and printed blank monthly attendance records for each child HAOUASH was registered with CDA or YMCA as the childcare provider.

18. Defendant HAOUASH submitted to CDA and YMCA completed attendance records for each child HAOUASH had purportedly provided childcare to in the preceding month, and certified under penalty of perjury the accuracy of the dates and times he provided care to a child.

///

19. Defendant HAOUASH, to obtain payment from CDA and YMCA, knowingly submitted and caused to be submitted attendance records containing materially false and fraudulent statements, specifically the dates and times he purportedly provided childcare to the children identified in the attendance records, and his false certification under penalty of perjury that that the information in the attendance records was true and correct.

20. Defendant HAOUASH submitted his attendance records to CDA and YMCA, both of which processed the records through the same third-party software and thereby caused interstate wire communications, specifically the transmittal of the attendance records to the third-party software company's server in Oregon.

21. CDA and YMCA relied on defendant HAOUASH's false and fraudulent statements in the attendance records and remitted payment to HAOUASH based on her materially false and fraudulent representations, promises, and intentional concealment and omission of material facts. In doing so, HAOUASH obtained funds from the United States Government that were intended to pay for childcare actually provided to low-income families.

**Use of the Wires**

22. On or about the dates set forth below, within the Southern District of California and elsewhere, defendant KHETAM KHLIEF HAOUASH, for the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, knowingly transmitted and caused to be transmitted by wire communications in interstate and foreign commerce, certain writings, signs, signals, and sounds as more particularly described below:

///

| Count | Approximate Date | Interstate Wire |
|---|---|---|
| **1** | June 2, 2026 | Electronic submission of May 2026 Attendance Record for Child 1 |
| **2** | June 2, 2026 | Electronic submission of May 2026 Attendance Record for Child 2 |
| **3** | July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 1 |
| **4** | July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 2 |

All in violation of Title 18, United States Code, Section 1343.

**Count 5**

**Money Laundering**

**18 U.S.C. § 1957**

23. On or about April 4, 2024, within the Southern District of California, defendant KHETAM KHLIEF HAOUASH did knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000.00, and which was derived from specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343, to wit: the wire transfer of $81,682.47 from HAOUASH's JPMorgan Chase Bank Account -1973 to an escrow company in connection with the purchase of real property at 686 Skyview St., El Cajon, CA 92020, all in violation of Title 18, United States Code, Section 1957.

**FORFEITURE ALLEGATIONS**

The allegations set forth in Counts 1 through 5 of this Complaint are realleged and incorporated as a part hereof for purposes of seeking forfeiture of property pursuant to Title 18, United States Code,

///

Sections 981(a)(1)(A)&(C), 982(a)(1), and 982(b), and Title 28, United States Code, Section 2461(c).

Upon conviction of one and more of the offenses in violation of Title 18, United States Code, Section 1343 set forth in Counts 1 through 4 of this Complaint, defendant KHETAM KHLIEF HAOUASH shall forfeit to the United States of America, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A), and Title 28, United States Code, Section 2461(c) and Title 21, United States Code, Section 853, all property, real and personal, which constitutes or is derived from proceeds of the offenses and all property traceable to such property, and all facilitating property.

Upon conviction of the offense in violation of Title 18, United States Code, Section 1957 as set forth in Count 5 defendant KHETAM KHLIEF HAOUASH shall forfeit to the United States all property involved in the offense pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and 982(a)(1). The property to be forfeited includes but is not limited to real property at 686 Skyview St., El Cajon, CA 92020.

If any of the forfeitable property, as a result of any act or omission of the Defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

///
///

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the Defendant up to the value of the forfeitable property.
All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(B), and Title 28, United States Code, Section 2461(c).

The complainant states that this complaint is based on the attached probable cause statement, which is incorporated herein by reference.

Rae Ocampo, Special Agent
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 3rd day of September 2026.

HON. DAVID D. LESHNER
United States Magistrate Judge

STATEMENT OF PROBABLE CAUSE

**A. Training and Experience**

1. I have been employed as a Special Agent with Homeland Security Investigations ("HSI") since December 2022. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. I am currently assigned to the HSI Office of the Special Agent in Charge, in San Diego, California, and specifically to the Costa Pacifico Money Laundering Group, which is focused on financial investigations.

2. All dates, times, and amounts herein are approximate.

**B. Background of Federally Subsidized Childcare Programs**

3. The United States Department of Health & Human Services provides federal funding to states to help low-income families pay for childcare expenses.

4. In California, there are four programs that provide subsidies to childcare providers servicing income-eligible families: CalWorks Stage 1, CalWORKs Stage 2 Alternative Payment ("C2AP"), CalWORKs Stage 3 Alternative Payment ("C3AP"), and California Alternative Payment Program ("CAPP"). In San Diego, the County of San Diego administers "Stage 1" subsidies, and two community organizations, Child Development Associates ("CDA") and the Young Men's Christian Association ("YMCA"), administer subsidies through the C2AP, C3AP, and CAPP.

5. Generally, if CDA or YMCA determines that a family is eligible to receive subsidized childcare services and their selected childcare provider registers with CDA or YMCA, has an active license to provide care at an approved facility from the State of California Department of Social Services ("CDSS"), and submits monthly attendance records documenting the childcare they provided, CDA and YMCA pay subsidies

///

directly to the childcare provider, via check or direct deposit, for providing childcare to registered income-eligible families.

6. The monthly attendance record forms have "self-certification" and signature sections for both the childcare provider and the parent, both of which begin "I declare under penalty of perjury that the information provided on this attendance record is true and correct[.]" Without a completed and signed attendance record, CDA and YMCA do not issue payment to registered childcare providers.

7. CDA and YMCA both use a third-party software company to transmit blank monthly attendance records forms to childcare providers. The attendance record forms include the childcare provider's name, the child's name, the parent's name, and a table for entering the child's "Time In" and "Time Out" on each day of the month. A childcare provider can submit completed attendance record forms to CDA and YMCA in-person, via mail, or through a software application; all submissions result in a copy of the completed attendance record being transmitted to the third-party software company's servers in Oregon.

8. California regulations state in part: "The licensee shall be present in the home and shall ensure that children in care are supervised at all times. When circumstances require the licensee to be temporarily absent from the home, the licensee shall arrange for a substitute adult to care for and supervise the children during his/her absence. Temporary absences shall not exceed 20 percent of the hours that the facility is providing care per day." Cal. Code Regs. Tit. 22, § 102417(a).

**C. Investigation Background**

9. Since February 2026, Homeland Security Investigations ("HSI") and IRS-CI have been investigating a scheme in which individuals in the Southern District of California receive licenses to operate childcare

facilities, register as childcare providers to families approved for subsidized childcare, and routinely submit materially false and fraudulent monthly attendance records to obtain subsidy payments. The attendance records are false and fraudulent in that they claim the individual provided care to children on dates and times that no actual childcare could have been provided, either because there were no children at the facility or the licensed provider was not at the facility--and in some instances was not even in the United States at the time of the purported childcare. CDA and YMCA rely on the accuracy of the attendance records when remitting payment to providers for the childcare they purportedly provided to low-income families.

10. Through the investigation, agents identified Defendant KHETAM KHLIEF HAOUASH as an individual who purported to provide childcare services in San Diego, California, which is in the Southern District of California, since at least 2021.

11. Defendant KHETAM KHLIEF HAOUASH, a resident of the Southern District of California, operated "HAOUASH, KHETAM FAMILY CHILD CARE" at an apartment on Ballantyne Street in El Cajon, California, within the Southern District of California. The license, effective May 12, 2021, authorized HAOUASH to provide care for up to eight children at the facility on Ballantyne Street.

12. Defendant KHETAM KHLIEF HAOUASH submitted to CDSS applications for a "location change" and later, a "capacity change", and received a license from CDSS to operate "HAOUASH, KHETAM FAMILY CHILD CARE" at an address on Emerald Avenue in El Cajon, California, within the Southern District of California. The license, effective October 24, 2022, authorized HAOUASH to provide care for up to 14 children at the facility on Emerald Avenue.

13. Defendant KHETAM KHLIEF HAOUASH submitted to CDSS an application for a "location change" and received a license from CDSS to operate "HAOUASH, KHETAM FAMILY CHILD CARE" at an address on Skyview Street in El Cajon, California, within the Southern District of California. The license, effective May 10, 2024, authorized HAOUASH to provide care for up to 14 children at the facility on Skyview Street

14. On February 14, 2023, HAOUASH signed a form submitted to CDA acknowledging in part "I understand when I sign anything under penalty of perjury I am declaring the information I have provided or statements I am making are factual, true and correct. Making false statements under penalty of perjury may result in prosecution and punishment under State and/or Federal laws." On March 2, 2023, May 14, 2024, May 28, 2024, and June 24, 2024, HAOUASH again signed forms submitted to CDA with the same acknowledgements noted above.

15. Since November 2023, HAOUASH has received payments from YMCA and CDA that totaled over $630,000.

16. Based on my training and experience and knowledge of this investigation, I believe HAOUASH is obtaining these funds by routinely submitting materially false and fraudulent attendance record forms that falsely claim she provided childcare to multiple children on dates when no children were at the facility and, in some instances, when HAOUASH herself was not even at the facility.

**D. HAOUASH Falsely Certified Attendance Records**

17. Based on my investigation, I believe HAOUASH falsely certified attendance records for May and June 2026.

18. On or about June 2, 2026, HAOUASH submitted 13 attendance records to CDA and 10 attendance records to YMCA and claimed under penalty of perjury to have provided childcare to 23 children in

May 2026. Combining the attendance records submitted to CDA and YMCA, HAOUASH claimed to have provided childcare every day of May 2026. Notably, HAOUASH's attendance records claimed that she cared for 15 children every weekday in May 2026, including to two two-year-old children, with care purportedly provided from as early as 8:05 a.m. to as late as 10:25 p.m. HAOUASH's attendance records claimed that she cared for eight children every weekend day of May 2026, including to Child 1 (a one-month-old baby), an 11-month-old baby, and Child 2 (a five-year-old child), with care purportedly provided from as early as 8:45 a.m. to as late as 11:10 p.m.

19. On or about July 1, 2026, HAOUASH submitted 12 attendance records to CDA and 10 attendance records to YMCA and claimed under penalty of perjury to have provided childcare to at least 22 children in June 2026. Combining the attendance records submitted to CDA and YMCA, HAOUASH claimed to have provided childcare every day of June 2026. HAOUASH's attendance records claimed that she cared for 11 children every weekday in June 2026, including to a two-month old baby, a two-year-old child, a three-year-old child, and a four-year-old child, with care purportedly provided from as early as 8:05 a.m. to as late as 10:20 p.m. HAOUASH's attendance records claimed that she cared for up to 11 children on multiple weekend days in June 2026, including to Child 1 (a two-month-old baby), 9-month-old twins, a one-year-old baby, and Child 2 (a five-year-old child), with care purportedly provided from as early as 8:45 a.m. to as late as 11:34 p.m.

20. Each of the attendance records HAOUASH submitted for the months of May 2026 and June 2026 listed "KHETAM HAOUASH" or "HAOUASH, KHETAM KHLIEF" as the provider and contained a dated signature under the "Provider Self-Certification" stating in part, "I declare under penalty

of perjury that the information provided on this attendance record is true and correct[.]" The only active childcare license HAOUASH had during those months was for "HAOUASH, KHETAM FAMILY CHILD CARE" on Skyview Street in El Cajon.

21. HAOUASH submitted the attendance records for March and April 2026 to CDA and YMCA in the Southern District of California, and she caused the following interstate wires when the attendance records were transmitted to the third-party software company's server in Oregon:

| Approximate Date | Interstate Wire |
|---|---|
| June 2, 2026 | Electronic submission of May 2026 Attendance Record for Child 1 |
| June 2, 2026 | Electronic submission of May 2026 Attendance Record for Child 2 |
| July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 1 |
| July 1, 2026 | Electronic submission of June 2026 Attendance Record for Child 2 |

E. **Stationary Remote Surveillance of HAOUASH's Facility**

22. The investigation team began stationary remote surveillance of HAOUASH's licensed facility on Skyview Street on or about May 26, 2026, until the end of the surveillance on or about June 25, 2026.[1] Of the 26 complete days captured in the surveillance recordings between May 27, 2026, through June 24, 2026, the investigative team did not observe more than six children entering HAOUASH's facility on any given day.[2]

---

[1] The stationary remote surveillance was out of operation from approximately June 10, 2026, at 12:44 p.m., to June 12, 2026, at approximately 6:06 p.m.

[2] The surveillance recordings do not include every minute of the 26 days; rather, the stationary remote surveillance recorded only for a

On every day of the surveillance period, HAOUASH claimed in the attendance records to have provided care to more children than the number of children observed entering her facility in the surveillance recordings. For example, HAOUASH claimed in the attendance records to have provided childcare to 15 children on May 28, 2026, yet only one child was observed entering the facility that day in the surveillance recordings.

23. The table below summarizes the number of children HAOUASH claimed to have provided care to in the attendance records she submitted to CDA and YMCA, and the number of children observed in the surveillance recordings:

| **Date [2026]** | **Children HAOUASH Claimed on Attendance Records** | **Children Observed at HAOUASH's Facility in Surveillance Recordings** |
|---|---|---|
| May 26 | 15 | 3 |
| May 27 | 15 | 3 |
| May 28 | 15 | 1 |
| May 29 | 15 | 3 |
| May 30 | 8 | 3 |
| May 31 | 8 | 3 |
| June 1 | 10 | 6 |
| June 2 | 10 | 4 |
| June 3 | 10 | 3 |
| June 4 | 10 | 3 |
| June 5 | 10 | 3 |
| June 6 | 8 | 3 |
| June 7 | 8 | 3 |
| June 8 | 10 | 3 |
| June 9 | 10 | 3 |
| June 13 | 8 | 3 |
| June 14 | 8 | 3 |
| June 15 | 10 | 4 |
| June 16 | 10 | 3 |
| June 17 | 10 | 3 |
| June 18 | 10 | 3 |

duration after detecting motion in the frame, including people or moving vehicles on the sidewalk, street, or driveway adjacent to the facility.

| Date [2026] | Children HAOUASH Claimed on Attendance Records | Children Observed at HAOUASH's Facility in Surveillance Recordings |
|---|---|---|
| June 19 | 10 | 3 |
| June 20 | 11 | 3 |
| June 21 | 11 | 3 |
| June 22 | 10 | 6 |
| June 23 | 10 | 3 |
| June 24 | 10 | 5 |
| June 25 | 10 | 3 |

24. Based on my review of the surveillance recordings, including patterns of arrival and departure from HAOUASH's facility, and a publicly available CDSS facility inspection report (which noted the presence of an unspecified number of HAOUASH's "minor children" were present during a pre-licensing inspection of the HAOUASH's facility), I believe there were three minor children residing at the facility with HAOUASH at the facility during the surveillance period.

25. In addition to HAOUASH claiming in attendance records to have cared for more children than the number of children observed entering the facility in the surveillance recordings, the times that HAOUASH claimed to have provided care in the attendance records are inconsistent with the surveillance recordings. For example, HAOUASH's attendance records claim she provided care to a four-year-old and a two-year old sibling set every weekday in May and June 2026, with their care beginning on or before 8:17 a.m.; but review of the surveillance recordings does not show two children arriving together in the morning before 8:17 a.m. during the surveillance period.

**F. Payments to HAOUASH**

26. After submitting the attendance records for childcare purportedly provided in May 2026 to YMCA, HAOUASH was issued payment

///

///

from YMCA that totaled to $7,128.97 on June 15, 2026, and an additional $3,357.29 on June 18, 2026.

27. After submitting the attendance records for childcare purportedly provided in May 2026 to CDA, including the attendance records for Child 1 and Child 2, HAOUASH was issued payment from CDA that totaled to $14,751.94 on June 16, 2026.

28. After submitting the attendance records for childcare purportedly provided in June 2026 to YMCA, HAOUASH was issued payment from YMCA that totaled to $11,117.16 on July 14, 2026.

29. After submitting the attendance records for childcare purportedly provided in June 2026 to CDA, including the attendance records for Child 1 and Child 2, HAOUASH was issued payment from CDA that totaled to $1,929.17 on July 14, 2026, and $8,532.74 on July 15, 2026

**G. HAOUASH's International Travel**

30. Border crossing records show HAOUASH:

a. Departed the United States on July 8, 2024, and returned to the United States on August 27, 2024; and

b. Departed the United States on February 16, 2026, and returned to the United States on March 5, 2026.

31. I have reviewed attendance records HAOUASH submitted to CDA and YMCA, and she claimed to have provided childcare to multiple children on all 69 days that border crossing records show she was not in the United States, or travelling to or from a foreign country, between July 2024 and March 2026.

32. Based on my training and experience and knowledge of this investigation, I believe HAOUASH submitted materially false and fraudulent attendance records that were fabricated to obtain payment for

childcare that HAOUASH did not actually provide in July 2024, August 2024, February 2026, and March 2026.

**H. HAOUASH Purchased a House**

33. From November 17, 2023, to March 2024, HAOUASH deposited payments from CDA and YMCA into JPMorgan Chase bank account -1973 that was opened on November 6, 2021. In March 2024, HAOUASH agreed to purchase a house located at 686 Skyview Street, El Cajon, California 92020, with a sale price of $763,000. Prior to closing, HAOUASH wired from JPMorgan Chase account -1973 to an escrow account $10,000 on March 6, 2024, and $81,682.47 on April 4, 2024.

34. Based on my review of HAOUASH's JPMorgan Chase bank account -1973, I did not observe any significant income besides the money from CDA and YMCA, which as described above, are from the fraudulent scheme.

**I. Conclusion**

35. Based on my training and experience, I believe HAOUASH executed a wire fraud scheme a date unknown but no later than May 2021 and continuing through at least July 1, 2026, in violation of 18 U.S.C. § 1343 and knowingly engaged in a monetary transaction with criminally derived property of a value greater than $10,000.00 when she transferred $81,682.47 from JPMorgan Chase bank account -1973 to an escrow company in connection with the purchase of real property at 686 Skyview Street, El Cajon, CA 92020 on March 6, 2024. I believe that based upon the foregoing the real property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Sections 981 (a)(1)(A) and 982 (a)(1).